IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01929-NRN

KENNETH BONDURANT,

Plaintiff,

v.

AAA INSURANCE d/b/a CSAA GENERAL INSURANCE COMPANY,

Defendant.

---

**ORDER ON
DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT
(Dkt. #39)**

---

**N. REID NEUREITER
United States Magistrate Judge**

This case is before the Court on the consent of the parties to magistrate judge jurisdiction (Dkt. #12) and an Order of Reference entered by Chief Judge Philip A. Brimmer. Dkt. #14. Now before the Court is Defendant AAA Insurance's ("AAA" or "CSAA") Motion for Partial Summary Judgment, filed June 20, 2022. Dkt. #39. Plaintiff filed a Response on July 14, 2022. Dkt. #44. The Court has reviewed the Motion and the Response. No reply is needed and oral argument will not assist in the determination of the matter. Defendant's Motion for Partial Summary Judgment is **GRANTED**.

This is a claim by an insured (Mr. Bondurant) against his uninsured/underinsured motorist insurance carrier, AAA. Mr. Bondurant claims that, after he was injured in an automobile accident by an underinsured driver, AAA breached its contract of insurance by not paying Mr. Bondurant the benefits to which he is entitled. Mr. Bondurant also

claims that AAA unreasonably delayed and denied payment. He alleges he is entitled to damages for AAA's statutory violations of Colo. Rev. Stat. §§ 10-3-1115 and 1116. AAA has moved for summary judgment on the unreasonable delay and denial claim and the claim for statutory violations.

**The Undisputed Facts**

Mr. Bondurant does not dispute any of the facts laid out in AAA's motion nor does he challenge AAA's recitation of the law. *See* Dkt. #44 at 2. Therefore, for purposes of AAA's motion, the following facts are deemed undisputed:

1. Mr. Bondurant was involved in a motor vehicle accident on July 21, 2016, with Gary Echelberger. Dkt. #27 at 2, ¶¶ 7–8, Pl.'s Second Am. Compl.; Dkt. #28 at 2, ¶ 7, Def.'s Answer to Pl.'s Second Am. Compl.

2. At the time of the subject accident, Mr. Echelberger was insured with an automobile insurance policy issued by Esurance. Dkt. #27 at 2, ¶ 9; Dkt. #28 at 2, ¶ 7.

3. The policy limit of Mr. Echelberger's liability insurance with Esurance was $25,000. Dkt. #27 at 2, ¶ 10; Dkt. 28 at 2–3, ¶ 8.

4. With CSAA's consent, Mr. Bondurant settled with Esurance for Mr. Echelberger's policy limit of $25,000. *Id.*

5. Mr. Bondurant was insured with CSAA, Policy No. COSS - 202244986, which Policy included UIM coverage with a policy limit of $500,000 per person/per incident. *See* Dkt. #39-1 at 2, Ex. A, CSAA Declarations Page.

6. Mr. Bondurant notified CSAA of the accident on July 21, 2016. *See* Ex. B at 32, CSAA Claim Notes. The Plaintiff told CSAA adjuster Chris Porras that he had two fractured L-spine vertebrae and had been transported by ambulance to Denver Health and released. *Id.* at 31.

7. Mr. Bondurant's Medical Payments benefits were exhausted on September 9, 2016. *See* Dkt. #39-3, Ex. C, Medical Payments Exhaustion Letter.

8. On September 16, 2016, CSAA placed 100% fault for the accident on Gary Echelberger. *See* Dkt. #39-2 at 29, Ex. B.

9. On September 27, 2016, the Mr. Bondurant told CSAA he was doing physical therapy and getting better. *See id.* at 27–28.

10. CSAA's handling of the property damage subrogation claim was completed on March 27, 2017 and the claim was closed until CSAA was contacted by Mr. Bondurant's counsel's office on April 29, 2019. *See id.* at 26.

11. On April 29, 2019, Aubrey Calvert-Larson from Mr. Bondurant's counsel's office informed CSAA that Mr. Bondurant was making a UIM claim. *See id.* at 25–26.

12. On May 2, 2019, Ms. Calvert-Larson told CSAA adjuster Marc Castle that she would send Mr. Bondurant's medical records they had received to date. *See id.* at 24.

13. On June 28, 2019, Mr. Castle left a voicemail with Mr. Bondurant's counsel's office asking if Mr. Bondurant's surgery had been completed. Mr. Castle did not receive a response. *See id.* 23.

14. On August 12, 2019, Ms. Calvert-Larson told Mr. Castle that she hoped to provide Mr. Bondurant's demand to CSAA in the fall. *See id.* at 22.

15. On October 15, 2019, Ms. Calvert-Larson informed Mr. Castle that Mr. Bondurant was in the process of being discharged from care and that she anticipated sending a demand to CSAA by early next year. *See id.* at 20–21.

16. On January 13, 2020, Mr. Castle spoke with Ms. Calvert-Larson to follow up on the status of Mr. Bondurant's UIM claim. She advised she was hoping to send Mr. Bondurant's demand to CSAA in the next couple of months. *See id.* at 19.

17. On February 27, 2020, Mr. Castle called and spoke with Ms. Calvert-Larson. She told Mr. Castle that Mr. Bondurant had completed treatment and they would send CSAA a demand once they had received all of his medical records and bills. *See id.* at 18.

18. The following month, on March 27, 2020, Mr. Castle called and spoke with Ms. Calvert-Larson, who told him that the Mr. Bondurant had elected not to pursue additional treatment and that they were gathering the post-loss records and bills and hoped to send a demand to CSAA within a few months. *See id.*

19. On May 19, 2020, Mr. Castle spoke with Ms. Calvert-Larson. She explained they were gathering the "balance" of Mr. Bondurant's prior records, that Plaintiff had a few last appointments once COVID restrictions loosened, and asked Mr. Castle to follow up in mid-July if he had not received the demand by then. *See id.* at 17.

20. Mr. Castle left a voicemail with Ms. Calvert-Larson on July 15, 2020, asking about the status of Mr. Bondurant's demand and asked for a return call. Mr. Castle's call was not returned. *See id.*

21. On August 14, 2020, Mr. Castle called and spoke with Ms. Calvert-Larson, who advised Mr. Bondurant was still seeking medical treatment, including injections and a 2nd opinion with an orthopedic doctor. *See id.* at 16.

22. On September 29, 2020, Mr. Castle left a voicemail with Ms. Calvert-Larson asking if the Mr. Bondurant had received additional injections or a second opinion. Mr. Castle did not receive a call back. *See id.* at 15.

23. On October 22, 2020, Mr. Castle called and spoke with Ms. Calvert-Larson. Ms. Calvert-Larson told him that Mr. Bondurant was completely done with treatment as of two weeks ago and that she hoped to send a demand to CSAA within the next month. *See id.*

24. On November 25, 2020, Ms. Calvert-Larson left a voicemail with Mr. Castle explaining she should be able to send Mr. Bondurant's demand in two weeks. *See id.* at 14.

25. On December 15, 2020, Ms. Calvert-Larson told Mr. Castle that she hoped to send Mr. Bondurant's demand to CSAA within the next few weeks and that there would not be a time limit on the demand. *See id.*

26. On January 12, 2021, Ms. Calvert-Larson told Mr. Castle the demand was done and would be sent out, but they would have to send supplemental records. *See id.* at 13.

27. CSAA received Mr. Bondurant's demand on January 26, 2021. *See id.* at 12.

28. On February 17, 2021, Mr. Castle wrote Ms. Calvert-Larson to confirm Mr. Bondurant was not expecting an offer until Plaintiff provided supplemental records and bills to CSAA. Ms. Calvert-Larson confirmed the same. *See id.* at 10–11.

29. Later that day, and on March 22, 2021, Ms. Calvert-Larson sent supplemental medical records and bills to CSAA. *See id.* at 9–10; *see also* Dkt. #39-4, Ex. D, March 22, 2021 Correspondence to CSAA enclosing Supplemental Records and Bills.

30. Mr. Castle completed his evaluation of Mr. Bondurant's UIM claim on April 16, 2021. *See* Dkt. #39-2 at 1–8, Ex. B. Mr. Castle included Mr. Bondurant's full past medical expenses of $183,006.53 in his evaluation. *See id.* at 5–6. Mr. Castle also included $43,100 of future recommended medical care and

    $53,893.47 to $88,893.47 for non-economic damages in his evaluation. *See id.* at 7. Mr. Castle's net evaluation of Mr. Bondurant's UIM claim after subtracting the $25,000 liability insurance limits was $255,000-$290,000. *See id.*

31. Mr. Castle extended an offer of $255,000 to Mr. Bondurant the same day and sent Mr. Bondurant a check for that amount. *See* Dkt. #39-5, Ex. E, April 16, 2021 Offer Letter and Fisher Payment.

32. On May 3, 2021, Mr. Bondurant filed his Complaint against CSAA. *See* Dkt. 5.

33. On June 7, 2021, CSAA increased its offer to Mr. Bondurant to $290,000 and sent a check for an additional $35,000. *See* Dkt. #39-6 Ex. F, June 7, 2021 Offer Letter and Payment.

34. Mr. Bondurant is not making a claim for lost wages or impairment of earning capacity. *See* Dkt. #39-7 at 2, Ex. G, Pl.'s Resp. to Def.'s First Set of Written Disc., Resp. to Interrog. No. 16.

**Defendant AAA's Argument**

In order to prevail on his claim for statutory unreasonable delay or denial pursuant to Colo. Rev. Stat. § 10-3-1116, the Plaintiff must demonstrate that CSAA delayed and/or denied payment of a covered benefit without a reasonable basis. *See* Colo. Rev. Stat. §§ 10-3-1115, 1116. A claim for unreasonable delay or denial of insurance benefits pursuant to Colo. Rev. Stat. § 10-3-1115 requires a showing that the insurer unreasonably delayed or denied benefits that were actually owed. *Id.* § 10-3-1115(1)(a).

In order to prevail on a claim for common law bad faith, Mr. Bondurant must prove four elements: (1) that he had injuries; (2) that AAA acted unreasonably in investigating, evaluating and adjusting the Plaintiff's claim; (3) that AAA knew its conduct was unreasonable or recklessly disregarded the fact that its conduct was unreasonable; and (4) that AAA's unreasonable conduct was a cause of the his

damages. CJI—Civ 25:2; *Travelers Ins. Co. v. Savio*, 706 P.2d 1258 (Colo. 1985); *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004).

The reasonableness of an insurer's conduct is "determined objectively, based on proof of industry standards." *Goodson*, 89 P.3d at 415. This necessarily means that in presenting a claim that an insurer has acted unreasonably in handling a disputed value claim, a plaintiff cannot rely upon merely subjective opinions as to whether the insurer's valuation was a reasonable one, but rather must present evidence that the insurer failed to comply with an objective claim handling standard. *Id.*; *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012).

The requirements of a common law bad faith claim are heightened in comparison to those of a statutory bad faith claim. *See Bucholtz v. Safeco Ins. Co. of Am.,* 773 P.2d 590, 592 (Colo. App. 1988) (noting that a claim for common law bad faith requires a showing that the insurer not only acted unreasonably, but also that such acts were done knowingly or recklessly). Both common law and statutory bad faith claims require a showing of unreasonable conduct. *Trujillo v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-0410-WJM-NRN, 2019 WL 3996882, at *8 (D. Colo. Aug. 23, 2019) (citing *Goodson*, 89 P.3d at 414).

AAA argues that Mr. Bondurant cannot prevail on his statutory bad faith claim because he cannot establish, via objective evidence, that AAA, without a reasonable basis, delayed or denied payment of UIM benefits that were owed. Per AAA, the timeline presented above (and which is not disputed in any way by Mr. Bondurant) establishes that there was no delay on AAA's part in the payment of UIM benefits. The timeline establishes that AAA paid the full requested amount of $183,006.53 of past

6

medical expenses within 30 days of receipt of supplemental records and bills. Mr. Bondurant's only past economic damages have been paid. In addition, AAA has paid the undisputed portions of future medical expenses and also non-economic damages.

AAA further argues that Mr. Bondurant cannot prove his common law bad faith claim, in part because AAA provided a reasonable offer to settle and a reasonable explanation for its offer. AAA already paid Mr. Bondurant $290,000 in UIM benefits and its adjuster explained that the amount included $183,006.53 of incurred medical expenses, $43,100 of future medical expenses, and $88,893.47 for Mr. Bondurant's non-economic damages, less the $25,000 he received from the underlying liability carrier. In light of this undisputed evidence, AAA argues that there is no evidence that AAA somehow acted unreasonably, failed to provide a reasonable explanation for its offer, or did so knowingly or with reckless disregard for Mr. Bondurant's rights.

**Mr. Bondurant's Argument That Genuine Issues of Fact Preclude the Grant of Partial Summary Judgment**

Mr. Bondurant has only one argument in opposition to AAA's Motion for Partial Summary Judgment. Mr. Bondurant relies on deposition testimony of AAA insurance adjuster, Senior Litigation Specialist Marc Castle. Mr. Bondurant insists that Mr. Castle was not aware of all the categories of damages to which a plaintiff would be entitled under Colorado law. And when Mr. Castle adjusted and valued Mr. Bondurant's claim, Mr. Castle only provided damages for two categories, "economic and noneconomic damages," while including "impairment" within the category of noneconomic damages. Dkt. #44 at 2.

Thus, Mr. Bondurant claims that by not breaking out damages for physical impairment as a separate category from noneconomic damages, and not being aware

that Colorado's jury instructions instruct a jury in a bodily injury case to award three categories of damages: economic, noneconomic, and for physical impairment, Mr. Castle failed to follow Colorado law and failed to comply with an objective claim handling standard. *Id.* at 3. Mr. Bondurant points to the model Colorado Jury Instructions on damages which explain that in considering damages for economic and noneconomic losses, the jury should be told "you shall not include actual damages for [physical impairment] [or] [disfigurement], since these damages, if any, are to be included in a separate category." *Id.* at 3–4 (citing Colo. Jury Inst., Civil 6:1).

According to Mr. Bondurant, Mr. Castle was not aware that there were three separate categories of damages under Colorado law, was not aware that he was required to consider all three categories (economic, noneconomic, and impairment), and therefore he did not consider a "separate category for Plaintiff's physical impairment." *Id.* at 5. In Mr. Bondurant's view, this "provides at least a disputed issue of material fact regarding whether Plaintiff was unreasonably denied payment for his physical impairment, due to Mr. Castle's failure to follow the law." *Id.* Mr. Bondurant argues that this supposed ignorance of separate categories of damages by Mr. Castle "creates a very strong inference for the jury that he may have intentionally ignored Plaintiff's physical impairment damages." *Id.* at 6. Mr. Bondurant claims that the jury should be entitled to assess Mr. Castle's credibility: "At the very least, there is strong evidence that [Mr. Castle] recklessly disregarded [Colorado] law by failing to review it when he knew that each state is different. As a result, there is a disputed issue of material fact whether this conduct was reckless." *Id.*

**Analysis and Decision**

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. Id.

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, Inc., v. City & Cnty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

Mr. Bondurant's argument in opposition to AAA's motion relies exclusively on the proposition that Mr. Castle *may* have failed to properly consider physical impairment in adjusting Mr. Bondurant's UIM claim. The argument is based on Mr. Castle's ignorance that that in Colorado, juries are instructed to break out any damages for impairment separately from any damages associated with noneconomic injury, such as pain and suffering. But there in no requirement that an insurance adjuster, in making an offer to an injured insured, break out or separate damages for impairment from other forms of non-quantifiable damages. An insurance adjuster is not a trial jury. An insurance

9

adjuster therefore need not precisely follow the format of a Colorado jury verdict form in making a settlement offer. As long as the insurance adjuster recognizes that damages for impairment are different from, and may be compensated in addition to, pain and suffering damages, and the adjuster has actually taken impairment damages into account in adjusting a claim, then no harm comes to the insured. There is no reckless or unreasonable conduct on behalf of the adjuster just because all non-monetary damages are included as part of one sum in a settlement offer.

A review of Mr. Castle's deposition shows unequivocally that he did consider physical impairment in adjusting Mr. Bondurant's claim. In explaining his understanding of the damages to which an injured insured would be entitled, Mr. Castle included physical impairment as a form of "noneconomic" damage. In Mr. Castle's view, the category of "noneconomic damages" included any damages for which there was no hard invoice listing a dollar amount. But there is no debate that Mr. Castle testified he did consider impairment to be a form of damage for which Mr. Bondurant was entitled to compensation:

> Q: So, Mr. Castle, let's talk about noneconomic damages. What categories are claimants allowed to get for noneconomic damages?
>
> A: The – excuse me – noneconomic damages would include their pain and suffering. We would take into consideration impairment if there is any, whether that's temporary or permanent.
>
> Q: Is that your understanding of the full extent of noneconomic damages?
>
> A: We would – we would consider the damages that are not monetarily defined, meaning there's not a bill attached to it. There's not an invoice that can be presented.
>
> Q: But in looking to evaluate it, what – what terms and adjectives and -- and words do you look at to determine how Colorado defines noneconomic damages?

10

> MS. WAGNER: Objection. Form and foundation.
>
> A: We look at pain, discomfort, effect on daily life, emotional damage or anxiety, impairment, temporary or otherwise.
>
> Q: So you include impairment under the category of noneconomic; is that correct?
>
> A: Correct.
>
> Q: So when you analyze Mr. Bondurant's damages, you had two categories of damages; economic damage and noneconomic damage; is that correct?
>
> A: Correct.
>
> Q: And you included physical impairment within the category of noneconomic damages; is that correct?
>
> A: I included all of the nonmonetary damages.
>
> Q: I need to be clear. You included physical impairment as part of noneconomic damages rather than a separate category of damages; is that correct?
>
> A: Correct.

Dkt. #44-1 (Marc Castle July 1, 2022, Dep. Tr. at 12:6–13:18).

Thus, the undisputed evidence before the Court is that Mr. Castle actually considered Mr. Bondurant's temporary and permanent impairment in adjusting his UIM claim. The fact that Mr. Castle did not separately separate and categorize "impairment" damages from other forms of non-quantifiable damages, like pain and suffering, does not create a disputed issue as to whether he "intentionally ignored Plaintiff's physical impairment damages." Mr. Castle says he did consider impairment damages. There is no evidence to suggest he did not. Mr. Bondurant has not come forward with any evidence to create a jury question on this issue.

The non-movant cannot defeat a summary judgment motion simply by expressing the intent to challenge the credibility of a moving party's witness. *See Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177 (10th Cir. 2000) (holding that, to avoid summary judgment, the non-moving party "must supply evidence of a question of fact for the case to go to the jury."); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 (9th Cir. 2000) (holding that asserting that a witness' statement may be disbelieved by the jury is not sufficient to withstand summary judgment); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1997) (holding that allowing summary judgment to be overcome by the non-movant's belief that he will be able to discredit a witness in cross-examination would render "summary judgment itself a dead letter, rather than the essential screening device it has become for litigation today"); *Thomas v. Runyon*, 108 F.3d 957, 961 (8th Cir. 1997) ("In order to defeat the [summary judgment] motion, plaintiff must develop some evidence or argument going beyond possible self-interest of the witness.").

So, even viewing the evidence presented in the light most favorable to Mr. Bondurant, there is no evidence that AAA acted unreasonably or recklessly in adjusting this claim, and no evidence that AAA ignored or failed to consider impairment damages to which Mr. Bondurant would be entitled under Colorado law.

**Conclusion**

For the foregoing reasons, it is hereby **ORDERED** that Defendant AAA's Partial Motion for Summary Judgment (Dkt. #39) is **GRANTED** and judgment will enter against the Plaintiff and in favor of the Defendant on Plaintiff's claims for unreasonable breach of contract and statutory violation of Colo. Rev. Stat. §§ 10-3-1115 10-3-1116.

It is further **ORDERED** that the Motion Hearing set for August 10, 2022 at 2:00 p.m. is **VACATED**.

Date: July 25, 2022

_____
N. Reid Neureiter
United States Magistrate Judge